☐ ORIGINAL

Approved: _Ashley C. Nicolas_
ASHLEY C. NICOLAS/ ANDREW JONES
Assistant United States Attorneys

Before:  HONORABLE JENNIFER E. WILLIS
United States Magistrate Judge
Southern District of New York

**23 MAG 5281**

------------------------------------------------ X
:
UNITED STATES OF AMERICA    :    SEALED COMPLAINT
:
-v.-    :    Violations of
:    18 U.S.C. §§ 2, 3, &
LUIS CERNA-MARROQUIN,    :    1952.
:
:    COUNTY OF OFFENSE:
Defendant.    :    NEW YORK
------------------------------------------------ X

SOUTHERN DISTRICT OF NEW YORK, ss.:

MICHAEL BONNER, being duly sworn, deposes and says that he is a Special Agent with Homeland Security Investigations ("HSI"), and charges as follows:

**COUNT ONE**
(Accessory After the Fact)

1. On or about June 18, 2023, in the Southern District of New York and elsewhere, LUIS CERNA-MARROQUIN, the defendant, knowing that an offense against the United States had been committed, to wit, a murder in aid of racketeering, did receive, relieve, comfort, and assist the offender, in order to hinder and prevent the offender's apprehension, trial, and punishment.

(Title 18, United States Code, Section 3.)

**COUNT TWO**
(Use of Interstate Commerce to Promote Unlawful Activity)

2. On or about June 18, 2023, in the Southern District of New York and elsewhere, LUIS CERNA-MARROQUIN, the defendant, knowingly traveled in interstate and foreign commerce and used the mail and a facility in interstate and foreign commerce, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, namely arson in violation of federal law and the laws of the State in which they were committed, and thereafter performed and attempted to promote, manage, establish, and carry on, and to facilitate the promotion, management,

establishment, and carrying on of that unlawful activity, and aided and abetted the same, to wit, CERNA-MARROQUIN drove and otherwise traveled from New York to Pennsylvania to promote, manage, and carry on arson and attempted arson, in violation of Title 18, Pennsylvania Consolidated Statutes, Sections 3301(a)(1)(i), 3301(c)(2), 3301(d)(1), 3301(d)(2), and 901.

(Title 18, United States Code, Sections 1952(a)(3)(A) and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

3. I have been involved in the investigation of this matter, and I base this affidavit on that experience, as well as on my conversations with other law enforcement agents, and my examination of various reports and records. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. In the course of this investigation, I have learned, among other things, the following:

4. Based on my review of reports prepared by detectives (the "Detectives") assigned to the Chester County Police Department in Chester County, Pennsylvania, I have learned, among other things, the following:

    a. On or about June 18, 2023, at approximately 5:45 p.m., law enforcement agents (the "Responding Officers") in Chester County, Pennsylvania, responded to 911 calls (the "911 Calls") reporting a brush fire, in the area of 2301 Eagle Farms Road, West Vincent Township, Chester County, Pennsylvania (the "Scene"). The initial reporting party reported, in sum and substance, seeing a brush fire or controlled burn, and a second reporting party, reported, in sum and substance, dumping water on the fire and discovering a human body.

    b. Upon arrival at the Scene, the Responding Officers observed, among other things, a burnt human body (the "Victim") surrounded by a section of burnt brush. The Responding Officers observed that the Victim's deceased body was covered in burns and appeared to have melted black plastic on the upper and lower sections of his body. Blood was observed in the area of the Victim's nose. A metal section of a lighter was located near the Victim's body, along with a spring. Fabric—some of the fabric exhibited a smell consistent with a flammable liquid—was also located near the Victim.

    c. At least two witnesses told law enforcement that they saw a white SUV or truck and three Hispanic men in the vicinity of the Scene on or about June 18, 2023, at approximately the time of the 911 Calls.

    d. Law enforcement officers later identified the Victim through fingerprint analysis. A member of the Victim's family also confirmed his identity.

5. Based on my review of License Plate Reader ("LPR") data, I have learned, among other things, the following:

    a. A white Mitsubishi Outlander with New York Registration KPY 342 (the "Outlander") crossed the Verrazano-Narrows Bridge from Brooklyn to Staten Island on or about June 18, 2023, at approximately 2:25 PM.

    b. Approximately three hours later, on June 18, 2023, at approximately 5:31 PM the Outlander traveled in the vicinity and in direction of the Scene. At approximately 5:47 PM, the Outlander traveled away from the Scene towards the Pennsylvania Turnpike.

    c. The Outlander returned to Brooklyn by crossing the Verrazano-Narrows Bridge on or about June 18, 2023, at approximately 7:41 PM.

  6. Based on my review of reports prepared by the Detectives, I have learned that, on or about June 30, 2023, the Detectives spoke with the registered owner of the Outlander. Among other things, the owner stated he had recently rented the Outlander to an individual identified as a confidential informant (the "CI") [1] and that the CI had been in possession of the Outlander on or about June 18, 2023.

  7. Based on my review of reports created after an interview with the Victim's family, as well as my review of surveillance video, I have learned, among other things:

    a. The Victim told his family, in sum and substance, that he was going to a bar called "El Toro" in Brooklyn, New York, on or about June 17, 2023, at approximately 11:18 PM. Based on my participation in this investigation, I have learned that the bar formerly called "El Toro" is now called "Black Horses Tavern."

    b. The Victim left the Black Horses Tavern at approximately 4:18 AM on June 18, 2023 and was driven away in the front passenger seat of a car that matches the appearance of the Outlander.

  8. Based on my participation in an interview (the "Interview") of a confidential informant (the "CI"), as well as my conversations with the CI and my review of recordings of the Interview, I have learned the following:

    a. On or about July 2, 2023, the Detectives contacted me to inform me, in sum and substance, that they were attempting to interview the CI. I contacted the CI to make sure that the CI knew that the Detectives wished to speak with the CI. The CI agreed to have me transport the CI to the 62nd Precinct to meet with the Detectives.

---

[1] Based on my involvement in the investigation, I have learned that the CI served as a confidential informant ("CI") for HSI from in or about 2019 up to and including November 2022. The CI has received monetary compensation, as well as immigration benefits, in exchange for the CI's assistance. I served as the CI's handler from in or about 2020 up until in or about November 2022. At the time of this offense, the CI was not an active CI.

    b. During the Interview, the Detectives were accompanied by homicide detectives from the New York City Police Department ("NYPD") as well as federal agents (collectively, the "Investigators"). The Interview was audio and video recorded.

    c. At the outset of the Interview, the CI was advised of the CI's *Miranda* rights. After being advised of the CI's rights, the CI agreed to talk to investigators. During the Interview, the CI said, among other things, the following:

      i. In the early morning hours of June 18, 2023, the CI met an individual known to the CI as "Chaparito," and later identified as the Victim, at the Black Horses Tavern (the "Bar"). While at the Bar, the CI and the Victim drank beer and consumed cocaine.

      ii. After they left the Bar, the CI drove the Victim, in the Outlander, to a particular home on 41st Street in Brooklyn, New York (the "Home") to meet up with some of the CI's friends.

      iii. Upon arrival at the Home, the CI and the Victim met up with an individual known to the CI as "Luis" and another individual ("CC-1")—both of whom were known to the CI as members of the gang MS-13. CC-1, "Luis," the CI, and the Victim continued to consume alcohol and cocaine inside "Luis's" bedroom in the Home, which was located at the end of a short hallway.

      iv. While they were drinking, the Victim disrespected "Luis" by interrupting him ("Luis") during conversations. "Luis" told the CI, in substance and in part that he ("Luis") was going to "do something crazy." CC-1 and "Luis" then assaulted the Victim by hitting and kicking him. While assaulting the Victim, "Luis" told the Victim, in sum and substance, that he ("Luis") was a member of MS-13 and could not be disrespected. The CI participated in the assault by kicking the Victim.

      v. During the assault, "Luis" reached inside of a cabinet and retrieved a handgun wrapped inside a towel. "Luis" then shot the Victim twice, in the back/hip and head. The Victim died immediately. After shooting the Victim, "Luis" returned the gun to a shelf in the bedroom.

      vi. After killing the Victim, "Luis" directed the CI to stay with the body, while CC-1 and "Luis" briefly left the Home. CC-1 and "Luis" later returned with trash bags and a wheelbarrow. The CI, CC-1, and "Luis" (the "Group") loaded the body in trash bags, put it in the wheelbarrow, and loaded it into the back of the Outlander. The Group then left the Home: the CI drove the Outlander; "Luis" sat in the passenger seat; and CC-1 sat in the back seat. Shortly after departing from the Home, the Group stopped at a gas station near 36th Street and 5th Avenue in Brooklyn where "Luis" purchased a gas can and filled it with gas.

      vii. The CI drove the Outlander from Brooklyn, through Staten Island, and to New Jersey. Because the CI was drunk and swerving, the CI and "Luis" eventually switched seats, and "Luis" drove the Outlander the remainder of the way to the Scene.

      viii. Approximately 10-15 minutes after the Outlander left a rest area, "Luis" pulled the car over in the vicinity of the Scene. The CI, "Luis," and CC-1 used the

4

wheelbarrow and took the body to the brush area. "Luis" poured gasoline on the body and lit it on fire. The Group then returned to the Home.

      ix.  Upon arriving back at the Home, "Luis" exited the Outlander and entered a blue Honda CRV, in which he departed the Home.

  9. Based on my review of an NYPD report, I have learned that on or about March 21, 2022, an individual identified in the report as "Luis Lerna" gave the address of the Home as his home address when reporting a stolen catalytic converter for a blue Honda CRV.

  10. Based on my review of records obtained from the Department of Motor Vehicles ("DMV"), I have learned that someone named "L.A. CERNAMARROQUIN" has a blue Honda CRV registered to the Home.

  11. Based on the CI's use of the name "Luis" when referring to the shooter, as well as the CI's reference "Luis's" use of a blue CRV, the NYPD report connecting the name "Luis Lerna" to the Home and a blue CRV, as well as the DMV records associating the name "L.A. CERNAMARROQUIN" with the Home and a blue CRV, I concluded that there was probable cause to believe that "Luis" is LUIS CERNA-MARROQUIN, the defendant.

  12. Based on my participation in the investigation as well as my review of reports prepared by other law enforcement officers, I have learned, among other things, the following:

  a. On or about July 3, 2023, I sent a photograph of LUIS CERNA-MARROQUIN, the defendant, obtained from an NYPD database (the "Mugshot") to NYPD officers (the "Surveilling Officers") responsible for conducting surveillance on the Home.

  b. On or about July 3, 2023, at approximately 7:00 PM, CERNA-MARROQUIN, arrived at the Home, driving a blue Honda CRV. The Surveilling Officers recognized CERNA-MARROQUIN based on their familiarity with the Mugshot and placed him under arrest.[2]

  c. During a search incident to arrest, the Surveilling Officers recovered three Washington, D.C. identification cards, all of which bore the name "LUIS ANTONIO CERNA-MARROQUIN" and a photograph of CERNA-MARROQUIN.

  13. Based on my participation in the investigation, including my participation in the search (the "Search") of the Home, I have learned, among other things, the following:

  a. On or about July 3, 2023, at approximately 9:30 PM, the Honorable Peggy Kuo, Magistrate Judge, Eastern District of New York, authorized a search warrant for the Home.

---

[2] LUIS CERNA-MARROQUIN, the defendant, is currently subject to deportation pursuant to a final order of removal.

    b. During the Search, law enforcement officers (the "Searching Officers") searched a bedroom located at the end of a hallway, consistent with the location of the murder, as described by the CI. The bedroom had been largely vacated.

    c. During the Search, the Searching Officers found, among other things, the following in the Bedroom: (i) mail addressed to LUIS CERNA-MARROQUIN, the defendant; (ii) trash bags and gloves; (iii) stains on the bedroom floor consistent in appearance with blood spatter; and (iv) a stain on the mattress consistent in appearance with a blood stain.[3]

  14. Based on my participation in this and other investigations targeting MS-13, I have learned that members of MS-13, often make significant efforts to maintain status within their organization, which sometimes includes using violence to retaliate for perceived disrespect.

  WHEREFORE, deponent respectfully requests that LUIS CERNA-MARROQUIN, the defendant, be imprisoned or bailed, as the case may be.

MICHAEL BONNER
Special Agent
Homeland Security Investigations

Sworn to before me this 5th of July, 2023

HONORABLE JENNIFER E. WILLIS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

---

[3] NYPD forensic investigators are currently processing evidence obtained from the Bedroom in order to determine, among other things, if the stains are in fact biological matter.